UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO.:

CIEANNA ALLEN

    Plaintiff,

vs.

CARECENTRIX INC

    Defendant.

_____/

## COMPLAINT

Plaintiff, ("Plaintiff"), CIEANNA ALLEN, by and through the undersigned counsel, hereby sues Defendants CARECENTRIX INC ("Defendant"), and in support aver as follows:

## GENERAL ALLEGATIONS

1. This is an action for damages in excess of Five Hundred Thousand Dollars ($500,000.00), exclusive of attorneys' fees, interest, and costs; and therefore, this action is within the jurisdiction of this Court. This action is brought by the Plaintiff for declaratory and injunctive relief and damages pursuant to the Florida Civil Rights Act of 1992, Florida Statute Section 760, et seq. ("FCRA"), to redress injury done to Plaintiff by the Defendant for discriminatory treatment on the basis of Disability, Retaliation and a Hostile Work Environment.

2. Declaratory, injunctive, legal and equitable reliefs are sought pursuant to the laws set forth above together with attorney's fees, costs and damages.

3. At all times material hereto, Plaintiff was a resident of Manatee County, Florida.

1

4. Defendant was a "person" and/or an "employer" pursuant to the Florida Civil Rights Act of 1992, *Fla. Stat. Section 760.01, et seq.,* since it employs fifteen (15) or more employees for the applicable statutory period, and it is subject to the employment discrimination provisions of the applicable statute, the FCRA.

5. At all times material hereto, Plaintiff was an "employee" within the meaning of the Florida Civil Rights Act of 1992, Fla *Stat. Section 760, et seq*. and is subject to the employment discrimination provisions of the applicable statute, the FCRA.

6. At all times material hereto, Plaintiff was an "employee" within the meaning of the Florida Civil Rights Act of 1992, Fla *Stat. Section 760, et seq*. and it is subject to the employment discrimination provisions of the applicable statutes.

7. Venue is proper in Manatee County, Florida because all of the relevant acts and omissions that form the basis of this Complaint occurred within Manatee County, Florida and payment was due in Manatee County, Florida, within the jurisdiction of this Honorable Court.

8. Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), which was dually filed with the Florida Commission on Human Relations.

9. More than 180 days have passed since the filing of Plaintiff's Charge of Discrimination and the Plaintiff has requested or otherwise obtained the Right to Sue. Plaintiff is timely filing suit.

10. All conditions precedent for the filing of this action before this Court have been met, including the exhaustion of all pertinent administrative procedures and remedies.

11. Plaintiff has retained the undersigned counsel in order that her rights and interests may be

protected. Plaintiff has become obligated to pay the undersigned a reasonable attorney's fee.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

12. Plaintiff was employed by Defendant on or around June 12, 2023, as a Billing/Collector.

13. Plaintiff worked remotely for Defendant, a medical company, in its billing department.

14. Plaintiff is an African American female who suffers from bipolar depression, post-traumatic stress disorder (PTSD), and anxiety, conditions diagnosed when Plaintiff was 21 years old.

15. Plaintiff's job duties included conducting out-of-pocket estimates for customers and responding to calls regarding remaining balances.

16. During the interview process, Plaintiff was told the position required handling only 30–40 calls per day.

17. Plaintiff and Plaintiff's training class were also informed that after completing 90 days of training, they would be able to rotate into "offline" duties, which would provide time off the phones.

18. Contrary to those representations, once Plaintiff began regular duties, Plaintiff was required to handle 70–100 calls per day due to short staffing and high turnover.

19. The calls were lengthy, stressful, and emotionally taxing, which negatively impacted Plaintiff's mental health.

20. After 90 days, Plaintiff requested offline duties as promised, but the opportunity was repeatedly denied.

21. Plaintiff's health began to decline as a result of the heavy call volume and stressful environment.

22. In December 2023, approximately six months after hire, Plaintiff requested ADA accommodations for intermittent leave due to Plaintiff's disabilities.

23. Plaintiff was granted ADA leave on or around December 14, 2023, through June 14, 2024, for up to 2–3 episodic incapacitations per week, lasting up to one day per episode.

24. The initial doctor who wrote Plaintiff's ADA documentation in December 2023 was Plaintiff's Primary Care Provider at the time, Emily Daka, Family PA-C. The subsequent FMLA and ADA accommodation paperwork was issued by Plaintiff's psychiatrist, PMHNP Marcia Spencer.

25. Plaintiff submitted medical documentation and recommendations from Plaintiff's psychiatrist to the Leave of Absence Department.

26. Despite these medical recommendations, Benefits Consultant Ann Geiger stated that Plaintiff's ADA-approved time off would not be accommodated because it would be "detrimental" to the company.

27. Plaintiff contacted Sun Life Health, the employee benefits company, who confirmed that Plaintiff was entitled to accommodation after ADA approval.

28. Only after Sun Life intervened was Ann Geiger forced to allow the ADA accommodation.

29. Plaintiff's requests for offline work were made every two months to Supervisor Ashley Sirois, but Plaintiff was repeatedly told "not yet" or "maybe next month."

30. Meanwhile, new and inexperienced employees were permitted to take offline duties, while Plaintiff was consistently denied such opportunities.

31. Plaintiff sought offline duties to reduce burnout, to avoid constant angry callers, and to demonstrate additional skills beyond phone calls.

32. Plaintiff observed that Lauren, a coworker, was promoted from Collector to Lead within two years, while Plaintiff was denied advancement opportunities despite tenure.

33. Plaintiff's mental health continued to decline due to the hostile work environment and lack of support from management.

34. Plaintiff utilized ADA leave intermittently as Plaintiff's mental episodes became more frequent and severe.

35. On or around June 12, 2024, Plaintiff applied for and was granted intermittent FMLA leave for up to 12 weeks as a reasonable accommodation.

36. Plaintiff was approved for intermittent FMLA leave for one year, through June 11, 2025, up to 40 hours per week, which Plaintiff used until March 2025.

37. Plaintiff never previously had to file ADA or FMLA leave with any employer for mental health conditions, but Defendant's environment made such requests necessary.

38. Around July 2024, Plaintiff's supervisor Ashley Sirois was let go.

39. Assistant Manager Shannon Ermellini temporarily assumed supervision of Plaintiff.

40. Shannon Ermellini was extremely intense, unpleasant, and began micromanaging Plaintiff on a daily basis.

41. Shannon frequently demanded one-on-one meetings about Plaintiff's calls and use of FMLA leave, which Plaintiff perceived as harassment.

42. Shannon would text Plaintiff's personal cell phone to accuse Plaintiff of not calling the attendance line, even when Plaintiff had properly reported absences.

43. Plaintiff often had to send Shannon screenshot proof of calls made to the attendance line to defend against false accusations.

44. When Plaintiff asked coworkers if Shannon treated them the same way, they responded "no," confirming that Plaintiff was being singled out.

45. Plaintiff maintained excellent job performance, receiving bonuses for high call quality scores.

46. Plaintiff consistently maintained one of the best average handle times (AHT), which measured how quickly Plaintiff moved between calls, proving Plaintiff's efficiency.

47. On September 4, 2024, Plaintiff experienced a power outage and properly called the attendance line and provided screenshot proof to Shannon.

48. Despite this, Shannon continued to badger Plaintiff via text messages, demanding repeated proof of the outage.

49. Plaintiff informed Shannon that once the power was restored, Plaintiff would email official documentation from the power company.

50. When Plaintiff attempted to retrieve proof during After Call Work (ACW), someone manually removed Plaintiff from ACW, forcing Plaintiff back onto calls.

51. Plaintiff immediately stated in the group chat that Plaintiff had asked not to be removed from ACW.

52. Plaintiff then privately messaged Shannon explaining that Plaintiff was trying to complete what Shannon requested but was forced back into calls.

53. Shannon read the message but did not respond.

54. Lead Pam Robinson later informed Plaintiff that Shannon herself had removed Plaintiff from ACW, despite being the one demanding proof of the outage.

55. Plaintiff documented this incident and retained screenshots as evidence.

56. In October 2024, Hurricane Milton caused Plaintiff's power to be out for five consecutive days.

57. Plaintiff provided documented proof from the electric company verifying the outage.

58. Plaintiff was displaced and suffered from significant stress and depression as a result of the hurricane.

59. On October 14, 2024, immediately after returning to work from the hurricane, Shannon pressured Plaintiff to resume work despite Plaintiff experiencing a major mental health episode.

60. That same day, Plaintiff had a call with a patient who was loud and argumentative about billing. When Plaintiff attempted to explain, the patient refused to listen and eventually hung up.

61. On October 15, 2024, Shannon met with Plaintiff via Teams video about the call, during which Plaintiff explained the mental health episode and hurricane hardship, but Shannon coldly dismissed Plaintiff's explanation and threatened termination.

62. On October 15, 2024, following the Teams meeting about the billing call, Shannon accused Plaintiff of mishandling the customer despite Plaintiff's medical explanation and the documented hardship caused by Hurricane Milton.

63. Shannon coldly dismissed Plaintiff's explanation, stating (not verbatim), "I'm not the only one in Florida that was affected by the hurricane." This was said in a meeting specifically about Plaintiff and why she had a bad call. Not only did Shannon dismiss what Plaintiff was going through, but she also stated something to the nature of, "Well, I'm going to have to forward this call to HR and you will most likely be terminated for it." Plaintiff felt intimidated. Instead of offering support, Shannon could have educated Plaintiff on how to

handle a future call given Plaintiff's mental state, especially since there was no training on how to handle irate callers who continued arguing after explanations were given.

64. Plaintiff felt intimidated, harassed, and targeted because of Plaintiff's disabilities and use of protected leave.

65. On October 16, 2024, Plaintiff reported Shannon's discriminatory treatment, harassment, and micromanagement to Jodie, the Human Resources Director.

66. Plaintiff informed Jodie that Shannon was treating Plaintiff differently than non-disabled employees, constantly monitoring Plaintiff, and threatening Plaintiff's employment.

67. Jodie acknowledged receipt of Plaintiff's complaint but failed to conduct a meaningful investigation or take corrective action.

68. After Plaintiff's report to HR, Shannon escalated her harassment of Plaintiff.

69. After Plaintiff complained to Jodie and Angela in HR about Shannon's ongoing poor behavior and requested not to deal with Shannon alone anymore, Plaintiff was no longer required to interact with Shannon directly. However, the micromanagement and retaliation were passed down to Kathleen Nicolo, a manager, and Jeff Sylvester, a new supervisor in training for Plaintiff's department.

70. Plaintiff began receiving retaliatory write-ups from both Jeff Sylvester, the supervisor in training, and Kathleen Nicolo, the manager, following Plaintiff's protected complaints.

71. Plaintiff viewed these write-ups as retaliation for reporting Shannon's conduct to HR.

72. In October 2024, Billing Department Manager Kathleen Nicolo also began issuing retaliatory write-ups against Plaintiff.

73. The write-ups Plaintiff received were issued by Jeff Sylvester, who was still new and in training, with Kathleen Nicolo overseeing and approving those write-ups. Plaintiff believes these actions were coordinated with Shannon in retaliation for Plaintiff's protected activity.

74. Despite the hostile environment, Plaintiff continued to meet or exceed performance goals, including call quality scores and efficiency metrics.

75. In February 2025, Plaintiff submitted a request for an extended ADA accommodation.

76. Plaintiff's psychiatrist again supported the need for increased accommodation, explaining that Plaintiff's symptoms were worsening due to workplace stress.

77. Defendant denied Plaintiff's request for extended ADA accommodation.

78. Instead of supporting Plaintiff, Defendant reduced Plaintiff's previously approved ADA accommodation to only one day off per month per episode.

79. This reduction made Plaintiff's accommodation virtually useless and placed Plaintiff at risk of discipline for unavoidable medical absences.

80. Plaintiff did not initiate contact with Benefits Consultant Ann Geiger. Instead, Ann Geiger contacted Plaintiff and arranged a sit-down meeting with her, Jeff Sylvester, and Plaintiff to discuss the denial of Plaintiff's accommodations.

81. Ann Geiger stated that Plaintiff could not be fully accommodated and threatened that Plaintiff would be terminated if Plaintiff took more time than the reduced allowance.

82. This created constant fear for Plaintiff, who worried that each medical episode could result in job loss.

83. In March 2025, Plaintiff reapplied under the ADA for accommodations.

84. Although Plaintiff was initially approved for up to 16 hours per week, Ann Geiger unilaterally reduced the accommodation to only 8 hours per month.

85. The drastic reduction conflicted with Plaintiff's psychiatrist's medical recommendations and disregarded Plaintiff's actual health needs.

86. Plaintiff protested the reduction but was told there was no alternative and that Plaintiff "had to work through it."

87. By this point, Plaintiff's workplace had become intolerable due to constant harassment, retaliation, denial of accommodation, and threats of termination.

88. In April 2025, Plaintiff applied for a new position within the billing department that did not require continuous telephone calls.

89. Plaintiff reasonably believed this position would allow Plaintiff to perform offline work, reduce stress, and better manage Plaintiff's disabilities.

90. The position Plaintiff applied for was supervised and filled by Assistant Manager Shannon Ermellini.

91. Plaintiff applied for the offline position upon returning to work on April 2, 2025, after taking five consecutive days off. Plaintiff's psychiatrist, NP Marcia Spencer, had issued return-to-work documentation per the request of Ann Geiger and Jeff Sylvester. On April 3, 2025, Plaintiff was issued a verbal corrective action for the absence, despite providing medical documentation and having ADA accommodations. Plaintiff believes Shannon, who oversaw the internal offline position, directed Jeff to issue the corrective action to disqualify Plaintiff from the position, as employees cannot have corrective actions within six months of applying.

92. This write-up invalidated Plaintiff's pending application for the position.

93. Plaintiff viewed this as a direct act of retaliation designed to prevent Plaintiff from transferring to a less stressful role.

94. Plaintiff had otherwise been qualified for the position and had the necessary experience to perform the duties.

95. On or around April 29, 2025, Plaintiff was terminated by Defendant.

96. Plaintiff's discharge occurred just before Plaintiff's FMLA annual renewal period, which would have extended Plaintiff's protected leave.

97. Plaintiff was informed verbally that the termination was due to misconduct after Plaintiff had an episode at work where Plaintiff spoke sternly with a client who refused to pay a bill.

98. Plaintiff maintains that the interaction with the customer did not amount to misconduct and was consistent with the normal stresses of handling hostile customers. Furthermore, Plaintiff's ADA paperwork for 2025 documented that Plaintiff should not have been interacting with anyone during an episode and should not have even been at work. However, Plaintiff was threatened with termination if any additional time was missed in April, leaving Plaintiff unable to call out or even leave work for a short time without risking termination.

99. Plaintiff believes this alleged "misconduct" was used as a pretext to justify termination.

100. Plaintiff never received a termination letter by mail or email, despite requesting documentation.

101. The absence of formal written termination documents further supports that Defendant's stated reason was pretextual.

102. Throughout employment, Plaintiff was promised a raise after one year of service.

103. Defendant failed to provide the promised raise despite Plaintiff completing one year of employment in June 2024.

104. Management made it seem as though nobody who started at CareCentrix at the same time as Plaintiff had received a raise. Plaintiff believed this representation and therefore did not make additional inquiries regarding a raise.

105. Plaintiff believes the denial of the raise was another form of discrimination and retaliation connected to Plaintiff's disabilities and complaints.

106. Plaintiff was treated less favorably than non-disabled employees with similar tenure and performance records.

107. Plaintiff observed that employees without disabilities, and those who had not complained about discrimination, were permitted more flexibility and opportunities for advancement.

108. Plaintiff, in contrast, was denied reasonable accommodations, subjected to heightened scrutiny, and denied advancement opportunities.

109. Plaintiff's repeated attempts to secure offline work or a transfer were ignored or blocked, while others with less seniority were given those opportunities.

110. Plaintiff's disability-related absences were consistently weaponized against Plaintiff, even though they were protected under ADA and FMLA.

111. Plaintiff was ultimately discharged in retaliation for requesting and using accommodations, for reporting discriminatory treatment, and because of Plaintiff's disabilities.

112. Throughout Plaintiff employment she was able to perform the essential functions of her job duties and responsibilities, and at all relevant times Plaintiff did perform her job at satisfactory or above-satisfactory level.

113. Any reason proffered by Plaintiff employer for the adverse employment actions is mere pretext for unlawful discrimination.

114. Plaintiff has retained the undersigned counsel so that her rights and interests may be protected and thus has become obligated to pay the undersigned a reasonable attorney's fee.

## COUNT I
### *Disability Discrimination in Violation of the FCRA*

115. Plaintiff re-adopts each and every factual allegation as stated in paragraphs 1-114 above as is set out in full herein.

116. Plaintiff has a disability and/or a perceived disability, including bipolar depression, PTSD, and anxiety, which substantially limit one or more major life activities, including concentrating, thinking, interacting with others, and working. Plaintiff is therefore a member of a protected class under the Florida Civil Rights Act.

117. Plaintiff was regarded as having or know to have a disability and/or a perceived disability by Defendant and Defendant's agents.

118. By the conduct described above, Defendant has engaged in discriminatory conduct against Plaintiff because of Plaintiff's disability and subjected the Plaintiff to disability-based animosity.

119. Such discrimination was based upon the Plaintiff's disability in that Plaintiff would not have been the object of discrimination but for the fact that Plaintiff has a disability and/or perceive disability.

120. Plaintiff can and did perform the essential functions of her job with or without reasonable accommodation.

121. Defendant's conduct complained of herein was willful and in disregard of Plaintiff's protected rights. Defendant and its supervisory personnel were aware that discrimination on the basis of Plaintiff's disability was unlawful but acted in reckless disregard of the law.

122. Defendant's discriminatory conduct was directly related to and because of Plaintiff's disability.

123. At all times material hereto, the employees exhibiting discriminatory conduct towards Plaintiff possessed the authority to affect the terms, conditions, and privileges of Plaintiff's employment with the Defendant.

124. Defendant retained all employees who exhibited discriminatory conduct toward the Plaintiff and did so despite the knowledge of said employees engaging in discriminatory actions.

125. As a result of Defendant's actions, as alleged herein, Plaintiff has been deprived of rights, has been exposed to ridicule and embarrassment, and has suffered emotional distress and damage.

126. The conduct of Defendant, by and through the conduct of its agents, employees, and/or representatives, and the Defendant's failure to make prompt remedial action to prevent continued discrimination against the Plaintiff, deprived the Plaintiff of statutory rights under state law.

127. The actions of the Defendant and/or its agents were willful, wanton, intentional, and made with malice or reckless indifference to the Plaintiff's statutorily protected rights, thus entitling Plaintiff to damages in the form of compensatory and punitive damages pursuant to state law, to punish the Defendant for its actions and to deter it, and others, from such action in the future.

128. Plaintiff has suffered and will continue to suffer both irreparable injury and compensable damages as a result of Defendant's discriminatory practices unless and until this Honorable Court grants relief.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter judgment against the Defendant; find that the Defendant indeed violated the FCRA, and in addition, order the following additional relief:

A. Declare that the acts complained of herein are in violation of the Florida Civil Rights Act.

B. Award Plaintiff compensatory damages for emotional distress, embarrassment and humiliation.

C. Grant a permanent injunction enjoining the Defendant, its officers, successors, assigns, and all persons in active concert or participation with it, from engaging in any employment practice which discriminates.

D. Reinstate Plaintiff to the same position she held before the retaliatory personnel action, or to an equivalent position.

E. Reinstate full fringe benefits and seniority rights to Plaintiff.

F. Order Defendant to make Plaintiff whole, by compensating Plaintiff for lost wages, benefits, including front pay, back pay with prejudgment interest.

G. For a money judgment representing prejudgment interest.

H. Grant Plaintiff's costs of this action including reasonable attorney's fees.

I. Grant Plaintiff a trial by jury.

J. Grant such other and further relief as the Court deems just and proper.

## COUNT II
### *Retaliation in Violation of the FCRA*

129. Plaintiff re-adopts and incorporates paragraphs 1-114 of this complaint as if set out in full herein.

130. Defendant is an employer as that term is used under the applicable statutes referenced above.

131. The foregoing allegations establish a cause of action for unlawful retaliation after Plaintiff engaged in a statutorily protected activity under the FCRA.

132. The foregoing unlawful acts by Defendant were purposeful.

133. Plaintiff is a member of a protected class because she has a disability that substantially limits one or more major life activities and requested a reasonable accommodation. Plaintiff was the victim of retaliation after engaging in a statutorily protected activity by requesting accommodations and complaining to Defendant about her medical condition. There is a causal connection between Plaintiff's request for accommodations, Plaintiff's complaints to Defendant, and the adverse employment actions taken thereafter.

134. As a direct and proximate result of the foregoing unlawful acts and omissions, Plaintiff has suffered mental anguish, emotional distress, expense, loss of benefits, embarrassment, humiliation, damage to reputation, illness, lost wages, loss of capacity for the enjoyment of life, and other tangible and intangible damages.

135. These damages are continuing and are permanent.

**WHEREFORE**, the Plaintiff respectfully requests that this Honorable Court enter judgment against the Defendant; find that the Defendant indeed violated the FCRA, and in addition, order the following additional relief:

A. Declare that the acts complained of herein are in violation of the Florida Civil Rights Act.

B. Award Plaintiff compensatory damages for emotional distress, embarrassment and humiliation.

C. Grant a permanent injunction enjoining the Defendant, its officers, successors, assigns, and all persons in active concert or participation with it, from engaging in any employment practice which discriminates.

D. Reinstate Plaintiff to the same position she held before the retaliatory personnel action, or to an equivalent position.

E. Reinstate full fringe benefits and seniority rights to Plaintiff.

F. Order Defendant to make Plaintiff whole, by compensating Plaintiff for lost wages, benefits, including front pay, back pay with prejudgment interest.

G. For a money judgment representing prejudgment interest.

H. Grant Plaintiff's costs of this action including reasonable attorney's fees.

I. Grant Plaintiff a trial by jury; and

J. Grant such other and further relief as the Court deems just and proper.

## COUNT III
### *Hostile Work Environment in Violation of the FCRA*

136. Plaintiff re-adopts each and every factual allegation as stated in 1-114 of this Complaint as if set out in full herein.

137. Defendant is an employer as that term is used under the applicable statutes referenced above.

138. The foregoing allegations establish a cause of action for unlawful discrimination after Plaintiff adversely affecting her under the FCRA.

139. Plaintiff, as an individual with a disability, is within a protected class as envisioned by the FCRA.

140. During her employment with Defendant, Defendant subjected Plaintiff to unwelcome harassment.

141. The harassment Plaintiff endured by Defendant was predicated on Plaintiff being an individua with a disability, is within a protected class as envisioned by the FCRA.

142. The harassment was decidedly severe, as Defendant had continuously harassed Plaintiff for her disability.

143. The harassment Plaintiff endured was severe and pervasive where Plaintiff agonized going work as she continually feared the harassment. Such conduct occurred during each of Plaintiff's workdays (not isolated to a single occurrence), was demonstratively abusive, and altered the conditions as of Plaintiff's employment as she could not complete her duties in a timely and orderly fashion due to the abuse. Finally, the conditions of Plaintiff's employment were ultimately altered and/or changed when she was ultimately terminated.

144. Defendant is liable for this conduct, either vicariously or directly, because Plaintiff's supervisor had knowledge of the harassment and abuse, and no remedial or disciplinary action was undertaken.

145. As a direct and proximate result of the foregoing unlawful acts and omissions, Plaintiff has suffered mental anguish, emotional distress, expense, loss of benefits, embarrassment, humiliation, damage to reputation, lost wages, loss of capacity for the enjoyment of life, and other tangible and intangible damages.

146. These damages are continuing and are permanent.

**WHEREFORE**, the Plaintiff respectfully requests that this Honorable Court enter judgment against the Defendant; find that the Defendant indeed violated the FCRA by failing to remedy this hostile work environment; and in addition, order the following additional relief:

A. Declare that the acts complained of herein are in violation of the Florida Civil Rights Act.

B. Award Plaintiff compensatory damages for emotional distress, embarrassment and humiliation.

C. Grant a permanent injunction enjoining the Defendant, its officers, successors, assigns, and all persons in active concert or participation with it, from engaging in any employment practice which discriminates.

D. Reinstate Plaintiff to the same position she held before the retaliatory personnel action, or to an equivalent position.

E. Reinstate full fringe benefits and seniority rights to Plaintiff.

F. Order Defendant to make Plaintiff whole, by compensating Plaintiff for lost wages, benefits, including front pay, back pay with prejudgment interest.

G. For a money judgment representing prejudgment interest.

H. Grant Plaintiff's costs of this action, including reasonable attorney's fees.

I. Grant Plaintiff a trial by jury; and

J. Grant such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury of all issues so triable.

Dated: September 8, 2025            Respectfully submitted,

*/s/: Anthony M. Georges-Pierre*
Anthony M. Georges-Pierre, Esq.
Fla. Bar No.: 0533637
***REMER, GEORGES-PIERRE,***
***& HOOGERWOERD, PLLC***
2745 Ponce de Leon Blvd
Coral Gables, FL 33134
(305) 416-5000- Telephone
**agp@rgph.law**